# In the United States Court of Federal Claims

No. 14-37L

(Filed: June 17, 2015)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| **KENNETH AND NORMA** | ) | Rails-to-trails takings case; liability for a |
| **CAQUELIN,** | ) | taking arising upon issuance of a NITU by |
|  | ) | the STB |
| **Plaintiffs,** | ) |  |
|  | ) |  |
| **v.** | ) |  |
|  | ) |  |
| **UNITED STATES,** | ) |  |
|  | ) |  |
| **Defendant.** | ) |  |
|  | ) |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Elizabeth McCulley, Stewart, Wald & McCulley LLC, Kansas City, Missouri, for plaintiffs.  With her on the briefs and at the hearing was Thomas S. Stewart, Stewart, Wald & McCulley LLC, Kansas City, Missouri.  With her on the briefs were Steven M. Wald, Stewart, Wald & McCulley LLC, St. Louis, Missouri, and J. Robert Sears, Baker Sterchi Cowden Rice, L.L.C., St. Louis, Missouri.

Julia S. Thrower, Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, United States Department of Justice, San Francisco, California, for defendant.  With her on the briefs was John C. Cruden, Assistant Attorney General, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

In this takings case, a Notice of Interim Trail Use ("NITU") issued by the federal Surface Transportation Board ("STB") authorized conversion of a portion of a railroad line located in Hardin and Franklin Counties, Iowa and its attendant right-of-way into a public recreational trail under Section 208 of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42 ("Trails Act") (codified at 16 U.S.C. § 1247(d)).[1]  Plaintiffs, Kenneth and

---

[1]The original purpose of the Trails Act "was to preserve unused railroad rights-of-way by converting them into recreational trails."  *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006) (citing *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1 (1990) ("*Preseault I*")). The Trails Act Amendments in 1983 included new provisions that created a "railbanking"

Norma Caquelin, owned two parcels of land adjacent to the railroad right-of-way on the date of the STB's action.  For one parcel, the predecessor railroad had acquired its interest by a right of way deed, and for the other parcel, the railroad had acquired its rights by condemnation. Plaintiffs allege that the successor railroad held easements limited to railroad purposes that were exceeded by issuance of the NITU, rendering the government liable for taking plaintiffs' property without just compensation under the Fifth Amendment.  *See, e.g.*, *Preseault I*, 494 U.S. at 12 (holding that the Tucker Act, 28 U.S.C. § 1491(a), provided a remedy for an alleged taking of a property interest in land previously used as a railroad right-of-way that had been transferred to a public entity for use as a public trail).[2] Before the court are plaintiffs' motion for partial summary judgment and defendant's corresponding cross-motion on the issue of liability.

For the reasons stated, the court concludes that the government is liable to the plaintiffs for the taking of their property upon the issuance of the NITU that exceeded the scope of the former easement.

## BACKGROUND[3]

The parties' dispute concerns a 10.46-mile strip of land extending from milepost 201.46 near Ackley, Iowa, to milepost 191.0, outside Geneva, Iowa, upon which North Central Railway Association, Inc. ("North Central Railway") previously acquired easements for railway purposes through a series of mesne conveyances.  Compl. ¶ 3.  A railroad had been constructed by the Eldora Railroad and Coal Company in 1866 from approximately one mile north of Eldora, Iowa, to Ackley, Iowa, for the purpose of transporting coal from the Coal Bank Hill area in the Iowa River valley near Eldora[4] to a connection at Ackley with an east-west railroad, then known as the Dubuque & Sioux City Railroad, which later became part of the Illinois Central Railroad.  *See* Pls.' Mem. in Support of Mot. for Partial Summary Judgment on Liability ("Pls.' Mot.") at 12-13, ECF No. 12.  Between 1868 and 1870, the line was extended north to Northwood, Iowa, and south to Marshalltown, Iowa, where it connected with the Chicago & North Western Railroad.

---

system that allowed rail carriers to transfer management of rail corridors to private or public entities for interim management as public recreational trails while preserving the ability to reactivate the abandoned rail corridors for potential future railroad use.  *See* 16 U.S.C. § 1247(d). A NITU serves as the mechanism that bars railroad abandonment during the pendency of trail-use negotiations.  *See Preseault I*, 494 U.S. 1.

[2]The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.

[3]The recitation of factual circumstances that follows is taken from the parties' pleadings, their cross-motions for partial summary judgment, and the documentary materials submitted with the parties' motions.

[4]Mining was discontinued many years ago.  The locality of the mine now is preserved in name by the Coal Bank Hill Bridge, which traverses the Iowa River between Fallen Rock State Preserve to the north and Pine Lake State Park to the south.  The bridge is listed on the National Register of Historic Places.

*Id*. at 13 & Ex. F (Historic Report (May 9, 2013)).  A predecessor extending the rail line, the Central Railroad of Iowa,[5] acquired rights in one of the parcels at issue by a right of way deed, *see id*. at Exs. A-2 (Maps of the Line) & J (Right of Way Deed by Henry and Maria Ihde to Central Railroad of Iowa (filed Apr. 30, 1870)), and rights to the second parcel by a condemnation, *see id*. at Ex. K (Latham Condemnation, Franklin County, Iowa (witnessed Aug. 31, 1870)).  North Central Railway acquired property rights in the rail corridor in 1989.  *See* United States' Cross-Mot. for Summary Judgment and Mem. in Support, and Opp'n to Pls.' Mot. for Partial Summary Judgment on Liability ("Def.'s Cross-Mot.") at 2-3, ECF No. 18.  The rail corridor traverses a rural area of fertile agricultural land.  *See id*. at 2; *see also* Pls.' Mot. Ex. I (Map of Parcels).  Plaintiffs are residents and citizens of Cedar Falls, Iowa, who acquired the two parcels, numbered 1219200016 and 1219200001, in Franklin County, Iowa, on May 17, 2007, adjacent to the rail corridor.  Compl. ¶ 4.  Plaintiffs allege that under Iowa law, they gained fee title up to the centerline of the rail corridor in question.  Compl. ¶ 4; *see also* Pls.' Mot. at 1-2 & Exs. G (Warranty Deed (May 11, 2007)), H (Summary of Parcels (Jan. 15, 2015)), & I (Map of Parcels); Hr'g Tr. 5:21-25 (May 14, 2015).[6]

On May 13, 2013, North Central Railway filed a Proposed Abandonment with the STB,[7] including a verified notice of exemption pursuant to 49 C.F.R. § 1152.50, seeking to abandon the railroad line on the grounds that "no local traffic has moved over the [l]ine for at least two years" and that "no local or overhead traffic has moved over or on the [l]ine for over five . . . years."  Def.'s Cross-Mot. at 3 (citing Pls.' Mot. Ex. F, at 4); *see also* Pls.' Mot. Ex. A-1 (Notice of Exemption (May 9, 2013)).[8]  Under STB regulations, the abandonment exception for the railroad

---

[5]The Central Railroad of Iowa was succeeded by the Central Iowa Railway and eventually became part of the Minneapolis and St. Louis Railway system.

[6]Further citations to the transcript of the hearing held on May 14, 2015 will omit reference to the date.

[7]The STB has authority "to regulate the construction, operation, and abandonment of most railroad lines in the United States."  *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004).

[8]49 C.F.R. § 1152.50 addresses abandonments and discontinuances of service and trackage rights that are exempt from the generally applicable procedures outlined under 49 U.S.C. § 10903 and provides, in pertinent part:

> An abandonment or discontinuance of service or trackage rights is exempt if the carrier certifies that *no local traffic has moved over the line for at least 2 years* and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a state or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Board or any U.S. District Court or has been decided in favor of the complainant within the 2-year period.  The complaint must allege (if pending), or prove (if decided) that the carrier has imposed an illegal embargo or other unlawful impediment to service.

line was scheduled to become effective July 5, 2013. *See* Pls.' Mot. at 11-12 (citing Ex. C, at 1 (STB Decision and Notice of Interim Trail Use or Abandonment (July 3, 2013))).

Shortly before the abandonment exception became effective, on June 25, 2013, the City of Ackley and the Iowa National Heritage Foundation (collectively "the City") filed a request for the issuance of a Public Use Condition under 49 U.S.C. § 10905 and a NITU under the Trails Act. *See* Pls.' Mot. Ex. B, at 1 (Pet. for Recons. (dated June 25, 2013 and entered June 26, 2013)); Hr'g Tr. 6:4-11 (noting that "the railroad initially applied purely for abandonment").[9] Two days later, on June 27, 2013, a letter from North Central Railway was entered with the STB indicating North Central Railway's agreement with the requested public use condition and related restrictions and its willingness to negotiate with the Iowa Trails Council regarding acquisition of the railroad line. *See* Def.'s Cross-Mot. at 3-4; *see also* Pls.' Mot. Ex. E (Letter to Chief, Section of Administration, Office of Proceedings, STB from counsel for North Central Railway (dated June 24, 2013 and entered June 27, 2013)). On July 3, 2013, STB accordingly issued a NITU for the railroad line. Pls.' Mot. Ex. C (STB Decision and Notice of Interim Trail Use or Abandonment (July 3, 2013)); *see also* Def.'s Cross-Mot. at 4; Compl. ¶ 5.[10] The NITU provided a 180-day period during which the railroad could negotiate with the potential trail group regarding "railbanking and interim trail use" of the corridor. Def.'s Cross-Mot. at 1 (citing Pls.' Mot. Ex. C, at 4). After the 180-day period, absent an extension, the NITU would expire by its own terms, at which point the railroad would be authorized to abandon the line. *See* Pls.' Mot. Ex. C, at 5.

On October 15, 2013, the Iowa Trails Council filed a Trail Use Request with the STB, and negotiations over a Trail Use Agreement ensued, contemplating that the rail corridor would be used as a public recreational trail with railbanking for possible future activation as a railroad. Compl. ¶ 6.[11] However, no agreement was reached. *See* Def.'s Cross-Mot. at 4. On December

---

49 C.F.R. § 1152.50(b) (emphasis added).

[9] 49 U.S.C. § 10905 provides, in relevant part:

When the [STB] approves an application to abandon or discontinue . . . , the [STB] shall find whether the rail properties that are involved in the proposed abandonment or discontinuance are appropriate for use for public purposes, including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation. If the [STB] finds that the rail properties proposed to be abandoned are appropriate for public purposes and not required for continued rail operations, the properties may be sold, leased, exchanged, or otherwise disposed of only under conditions provided in the order of the [STB].

49 U.S.C. § 10905.

[10] Plaintiffs maintained ownership over the two parcels in question on that date. Compl. ¶ 4.

6, 2013, the Iowa National Heritage Foundation requested a 180-day extension to continue negotiations, *see id.* Ex. 1 (Letter to Cynthia T. Brown, STB, from President, Iowa Natural Heritage Foundation (Dec. 6, 2013)), but North Central Railway did not file a letter indicating its consent. On December 30, 2013, the NITU expired. *See id.*, *see also* Hr'g Tr. 29:22 to 30:4. On March 31, 2014, the railroad consummated abandonment of its line, and the STB's regulatory jurisdiction ended. Def.'s Cross-Mot. at 2, 4 & Ex. 3 (STB Decision (May 9, 2014)). On April 24, 2014, North Central Railway notified the STB that it had exercised the authority to fully abandon the line. Pls.' Mot. Ex. D (Notice of Consummation (Apr. 24, 2014)).

On January 16, 2014, plaintiffs filed suit in this court. In their complaint, they allege an uncompensated taking of their property in contravention of the Fifth Amendment. Specifically, plaintiffs argue that cessation of railroad activities across the burdened property effected an abandonment under Iowa law of the railroad-purposes easement, leading to a taking when the STB prevented plaintiffs from regaining use and possession of their property. Compl. ¶¶ 7-9. Plaintiffs aver that the government's action "diminish[ed] the value of the remaining property[] and [engendered] delay damages based upon the delayed payment of compensation." Compl. ¶ 10. Plaintiffs request damages equal to the "full fair market value of the property . . . on the date it was [allegedly] taken, including severance damages and delay damages, and costs and attorneys' fees" in addition to "such further relief as [the] [c]ourt may deem just and proper." Compl. at 3.

On January 16, 2015, plaintiffs filed their motion for partial summary judgment on the issue of liability. *See* Pls.' Mot. On March 6, 2015, the government responded with a cross-motion for partial summary judgment on the same issue. *See* Def.'s Cross-Mot. These cross-motions have now been thoroughly briefed and were argued at a hearing held on May 14, 2015.

## STANDARD FOR DECISION

A grant of summary judgment is appropriate if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"). A material fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor of either party. *Id.* at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). To establish "that a fact cannot be or is genuinely disputed," a party must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A). If the record taken as a whole "could not lead a rational

---

[11]The complaint incorrectly lists the date as October 15, 2001. Compl. ¶ 6.

trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The same standard applies when the parties have cross-moved for summary judgment. *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968 (Fed. Cir. 2009). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). Rather, the court must evaluate each motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

## ANALYSIS

To find a taking giving rise to liability under the Fifth Amendment in a rails-to-trails case, the court must perform a three-part analysis outlined by the Federal Circuit in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) ("*Preseault II*"):

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates;
>
> (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and
>
> (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

100 F.3d at 1533; *see also Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009); *Haggart v. United States*, 108 Fed. Cl. 70, 77 (2012); *Geneva Rock Prods., Inc. v. United States*, 107 Fed. Cl. 166, 170 (2012); *Ingram v. United States*, 105 Fed. Cl. 518, 534 (2012); *Longnecker Prop. v. United States*, 105 Fed. Cl. 393, 405 (2012); *Beres v. United States*, 104 Fed. Cl. 408, 423-24 (2012); *Jenkins v. United States*, 102 Fed. Cl. 598, 605 (2011). To prevail, plaintiffs must demonstrate that the railroad held only an easement, rather than a fee simple estate, on their property, and that either the easement did not encompass future use as a public recreational trail or that it terminated prior to the alleged taking.

### A.  *Easements*

Plaintiffs have satisfied the first element of the *Preseault II* inquiry because it is undisputed by the parties that North Central Railway possessed only an easement for railroad purposes derived from the 1870 Ihde deed and the 1870 Latham Condemnation. *See* Def.'s Cross-Mot. at 3 ("For purposes of summary judgment, the United States does not dispute that under applicable Iowa law and the original deed to the railroad and condemnation proceedings, the railroad acquired an easement for railroad purposes to the segments of the corridor adjacent

to the two parcels of land owned by the [p]laintiffs on the date the NITU was issued."); *see also* Hr'g Tr. 13:23 to 14:1 ("[O]n the first factor [of the *Preseault II* inquiry], there is no dispute for purposes of the summary judgment [motion] that the [p]laintiffs . . . owned fee simple the right-of-way or the rail corridor."). "Under Iowa law, deeds are interpreted according to the ordinary rules of contract construction." *Burgess v. United States*, 109 Fed. Cl. 223, 228 (2013) (citing *Wiegmann v. Baier*, 203 N.W.2d 204, 206 (Iowa 1972); *Maxwell v. McCall*, 145 Iowa 687, 124 N.W. 760 (1910); *Jackson v. Benson*, 54 Iowa 654, 7 N.W. 97 (1880)). Here, the relevant "Right of Way Deed" from Henry and Maria Ihde granted a right of way to the railroad company for "construction of said road," Pls.' Mot. Ex. J, and thus "conveyed to the railroad only an easement for railroad purposes," *Macerich Real Estate Co. v. City of Ames*, 433 N.W.2d 726, 729 (Iowa 1988). Similarly, the Latham Condemnation was "occasioned by the location of the Central Railroad of Iowa, over and across the lands of H. E. Latham," Pls.' Mot. Ex. K, and led to acquisition by the railroad of an easement, *see Hastings v. Burlington & M.R.R.*, 38 Iowa 316 (1874) (holding that with a condemnation for railroad purposes, landowners hold fee title and railroads acquire nothing more than an easement by the condemnation); *see also McKinley v. Waterloo, R.R.*, 368 N.W.2d 131, 133-35 (Iowa 1985) (same). In sum, the Central Railroad of Iowa acquired, and the North Central Railway as successor held, an easement while the plaintiffs retained fee simple title to the parcels. *See McClurg Family Farm, LLC v. United States*, 115 Fed. Cl. 1, 7-11 (2014) (applying Iowa statutory and judicial precedents); *see also Burgess*, 109 Fed. Cl. at 230-31 (same); *Jenkins v. United States*, 102 Fed. Cl. 598, 607 (2011) (same). The court thus must proceed to the other elements of the *Preseault II* analysis.

## B.  *Limited Use for Railroad Purposes*

In rails-to-trails cases, a taking by the government is established if the railroad acquired only an easement, the easement was limited to railroad purposes, and the scope of the easement does not include recreational trail use upon issuance of a NITU. *See Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010), *reh'g and reh'g en banc denied*, 646 F.3d 910 ("It is settled law that a Fifth Amendment taking occurs in [r]ails-to-[t]rails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, *if trail use is outside the scope of the original railway easement*.") (emphasis added). Plaintiffs claim that the STB's issuance of the NITU exceeded the scope of the easement by blocking their reversionary interest and contemplating conversion of the railway into a recreational trail. Pls.' Mot. at 19. Therefore, plaintiffs contend that they are entitled to compensation for a temporary taking of their property. *Id.* at 2.

The government acknowledges that the easements granted to North Central Railway were limited to railroad purposes and did not include recreational trail use. *See, e.g.*, Def.'s Cross-Mot. at 15. However, it contends that the question of whether trail use exceeds the scope of the railroad's easement is "irrelevant" under the circumstances presented because the NITU was in effect for only six months and expired on its own terms, and because no interim trail-use agreement was reached. Def.'s Cross-Mot. at 16; *see also* Hr'g Tr. 14:6-9. The government emphasized that "there was no actual non-railroad use that occurred during the time that the NITU was effective." United States' Reply in Support of Cross-Mot. for Summary Judgment ("Def.'s Reply") at 1, ECF No. 20. Therefore, in the government's view, "[a]lthough the issuance of the NITU may have delayed the railroad's abandonment of an easement . . . , that

delay did not defeat [p]laintiffs' interests nor burden those interests in a manner that rises to the level of a compensable taking."  Def.'s Cross-Mot. at 15.

In support of its position, the government largely relies upon, but seeks to distinguish, the Federal Circuit's decisions in *Caldwell*, 391 F.3d 1226, and *Barclay*, 443 F.3d 1368, in which the court of appeals addressed the question of the proper date of accrual in Fifth Amendment rails-to-trails actions.  In *Caldwell*, the court held that because the issuance of a NITU is "the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way," the proper date of accrual of a takings claim is the date of the NITU issuance.  391 F.3d at 1233-34 (emphasis in original); *see also* Def.'s Cross-Mot. at 11-12.  The court explained:

> [T]he NITU operates as a single trigger to several possible outcomes.  It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked. . . .  Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment.  In these circumstances, a temporary taking may have occurred.  It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.

*Caldwell*, 391 F.3d at 1234 (citing *Preseault II*, 100 F.3d at 1552; *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004)).  In *Barclay*, the court of appeals reaffirmed this resulting "bright-line rule" by holding that the proper date of accrual for several landowners' claims was the date of the NITU issuance.  443 F.3d at 1378.

The government attempts to distinguish *Caldwell* and *Barclay* by observing that while in those cases the STB's issuance of a NITU had led to an interim trail use agreement, no such agreement was reached here.  *See* Def.'s Cross-Mot. at 11-12.  In addition, the government underscores that in *Caldwell*, the Federal Circuit employed noncommittal language and specifically left open the question of whether issuance of a NITU itself was sufficient to trigger a temporary takings claim, noting that, "[t]his case does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached."  391 F.3d at 1234 n.7.  Correlatively, the government points out that the court's decision in *Barclay* also did not address a temporary takings claim.  *See* 443 F.3d 1368.  On this basis, the government avers that whether the issuance of a NITU gives rise to a compensable takings claim where no trail agreement is reached and the NITU is not extended is an open question and urges the court to find that the United States is not liable for a taking because "there was no transfer of the railroad's easement" and therefore "no resulting trail use."  Def.'s Cross-Mot. at 16; *see also* Hr'g Tr. 22:1-7.

In the Federal Circuit's decision in *Ladd*, 630 F.3d 1015, the government raised, and the court of appeals rejected, virtually identical arguments to those the government is now making.  *Ladd* concerned landowners who owned tracts adjacent to a railway in Cochise County, Arizona.  The landowners brought a Fifth Amendment takings action against the government after the STB issued a NITU suspending abandonment proceedings by the local railway.  *Id.* at 1017-18.  After no trail use agreement was reached, the negotiating period was extended.  *Id.*  At the time that

plaintiffs' claims were first considered on the merits, the NITU was set to expire and trigger the consummation of abandonment of the easement in the following year.  The trial court concluded that no taking had occurred, reasoning that "[a] physical taking cannot have occurred in these circumstances, where neither the NITU nor another aspect of the federal abandonment process has resulted in construction of a trail for public use."  *Ladd v. United States*, 90 Fed. Cl. 221, 226 (2009), *rev'd and remanded*, 630 F.3d 1015.  The court justified its position by explaining that "[i]ssuance of a NITU cannot be a physical taking where the landowners have not suffered a physical invasion of the property in which they claim interests."  *Id.*

The Federal Circuit reversed.  In doing so, the court stated that it found the government's attempts to distinguish *Caldwell* and *Barclay* to be unpersuasive, reasoning:

> In *Caldwell* and *Barclay,* we indicated that physical occupation is not required.  *See, e.g.*, *Barclay*, 443 F.3d at 1374 ("The barrier to reversion is the NITU, not physical ouster from possession.").  Indeed, the Barclay appellants' claim accrued while the railroad was still operating.  *Id.*  "In general, a takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'"  *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000).  Because according to our precedent, a takings claim accrues on the date that a NITU issues, events arising after that date—including entering into a trail use agreement and converting the railway to a recreational trail—cannot be necessary elements of the claim.  *Hence it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established.*

*Ladd*, 630 F.3d at 1024 (emphasis added).[12]

The Federal Circuit's decision in *Ladd* is dispositive here.  The court specifically addressed and contemplated the circumstance where a NITU is issued and no trail use agreement is reached.  *See Ladd*, 630 F.3d at 1025.[13]  As the court of appeals specified, the action by the government that gives rise to a takings claim is the issuance of a NITU by the STB, regardless of the events that follow.  *Id.* at 1025.  The court stated that "where no trail use agreement is reached, the taking may be temporary. . . .  However, physical takings are compensable, even when temporary."  *Id.* (citing *Caldwell*, 391 F.3d at 1234; *Barclay*, 443 F.3d at 1348; *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991) ("A taking can be for a limited term—what

---

[12]The Federal Circuit in *Ladd* also observed that holding otherwise could potentially deprive landowners of the opportunity to file takings claims entirely if the STB allowed extensions to continue negotiations beyond the six-year statute of limitations period following the issuance of a NITU.  *Ladd*, 630 F.3d at 1024 ("[L]andowners whose property is subject to a NITU would be left in the untenable position of having the six-year limitations period running—and even expiring—before they could file suit.").

[13]On remand, the trial court in *Ladd* awarded compensation for a temporary taking.  *Ladd v. United States*, 108 Fed. Cl. 609 (2012), *aff'd in relevant part and rev'd in a separate respect*, 713 F.3d 648 (Fed. Cir. 2013).

is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute."); *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641-42 (1987)).[14]  In *Ladd*, the court concluded that "the duration of the taking goes to damages, not to whether a compensable taking has occurred." *Id.*[15]

---

[14]These statements by the court squarely refute the government's assertion "that the opinions in *Caldwell* and *Barclay* and *Ladd* don't really address or opine on whether an issuance of a NITU involves a compensable temporary taking when no agreement is reached."  Hr'g Tr. 28:1-5.

  The government's position was also rejected by a judge of this court in *Farmers Cooperative Co. v. United States*, 98 Fed. Cl. 797 (2011), *recons. denied*, 100 Fed. Cl. 579 (2011), which involved the issuance of a NITU where the rail corridor never was converted to use as a recreational trail.  The court reasoned that "[b]ecause the issuance of the NITU by the STB . . . forestalled the abandonment process in favor of the potential conversion of the railroad right-of-way to a use outside the scope of the original easement, it blocked the vesting of [p]laintiffs' state law reversionary interests" and therefore constituted a taking.  *Id.* at 805 (citing *Ladd*, 630 F.3d at 1023) (in turn citing *Caldwell*, 391 F.3d at 1233-34).

[15]The government argues that unlike the circumstances in *Ladd* and *Farmers Cooperative* in which "the interference with the plaintiffs' 'reversionary' interests was for a period of five to six years," in this case "the NITU was in place for only 180 days" and "the railroad did consummate abandonment . . . shortly after the NITU expired."  Def.'s Reply at 5; *see also* Hr'g Tr. 12:7-15.  The government suggests that any interference was "minimal" given that the railroads had held the easement "for over 140 years."  Def.'s Reply at 5; *see also* Hr'g Tr. 25:4-7 ("[I]f there is a temporary taking, you have to at least go through a balance of factors in establishing whether that taking is compensable."); Hr'g Tr. 27:5-7 ("[A]fter 140-plus years of a railroad track in place, it was probably not prime agricultural land.").  The government's arguments are unavailing because they address the issue of damages rather than liability.  In that respect also, the government's offhand comment about value may not be accurate as an evidentiary matter because the surrounding land is sufficiently productive that neighboring farmers "ban[d]ed together and bought [the rail easement to] their own land back."  Hr'g Tr. 30:2-3.

  Applying *Ladd* to the facts at issue is also consistent with Supreme Court precedent on the subject.  In *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511 (2012), the Supreme Court held that government-induced flooding of temprorary duration may be compensable. The Court specified that "we have rejected the argument that government action must be permanent to qualify as a taking." *Id.* at 519.  Similarly, in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Court observed that an easement of passage of cables, although not a permanent occupation of land, constitutes a physical invasion that "is a government intrusion of an unusually serious character."  *Id.* at 433 (citing *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) (involving the government's imposition of a navigational servitude requiring public access to a landowner's pond)).  The Supreme Court has also specified that once the government's actions have "worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during

Accordingly, in light of the termination of the NITU, the court finds that a temporary taking occurred.

### C.  *Ownership of the Underlying Fee*

A qualifying plaintiff must have owned pertinent property on the date of the taking.  The date of the taking is identified as the date "when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. . . . [T]his occurs when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment." *Caldwell*, 391 F.3d at 1233; *see also Ladd*, 630 F.3d at 1025; *Barclay*, 443 F.3d at 1373 ("Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU."). Therefore, the date of the taking is July 3, 2013, when the NITU was issued.  The government has not disputed that plaintiffs then owned the adjacent property and the underlying fee to the centerline of the rail corridor.

### CONCLUSION

For the reasons stated, the government is liable for the taking of plaintiffs' property on July 3, 2013, upon issuance of the NITU.  Accordingly, plaintiffs' motion for summary judgment on liability is GRANTED.  The government's cross-motion for summary judgment on the same issue is DENIED.

The court requests that the parties file a joint status report by July 16, 2015, providing a plan and schedule for addressing damages.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

which the taking was effective."  *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 321 (1987).