# In the United States Court of Federal Claims

No. 14-37L

(Filed: November 6, 2018)

**************************************

|  |  |  |
|---|---|---|
| **NORMA CAQUELIN,** | ) | Post-trial decision on remand in a rails-to- |
| | ) | trails takings case; liability for a |
| **Plaintiff,** | ) | temporary taking arising upon issuance of |
| | ) | a NITU by the Surface Transportation |
| **v.** | ) | Board |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

**************************************

 

Thomas S. Stewart, Stewart, Wald & McCulley LLC, Kansas City, Missouri, for plaintiff.  With him at the trial and on the briefs was Elizabeth McCulley, Stewart, Wald & McCulley LLC, Kansas City, Missouri.  Also with him on the briefs were Steven M. Wald of Stewart, Wald & McCulley LLC, St. Louis, Missouri, and J. Robert Sears, of Baker Sterchi Cowden & Rice, L.L.C., St. Louis, Missouri.

Kristine S. Tardiff, Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, United States Department of Justice, Concord, New Hampshire for defendant.  With her on the briefs was Jeffrey H. Wood, Acting Assistant Attorney General, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C.

### OPINION AND ORDER

LETTOW, Senior Judge.

This rails-to-trails takings case is before the court after a trial held on remand from the United States Court of Appeals for the Federal Circuit.  The remand directed the court to develop a factual record bearing on the government's contention that a set of precedents in the court of appeals should be overruled.  *See Caquelin v. United States*, 697 Fed. Appx. 1016 (Fed. Cir. 2017) ("*Caquelin II*"), *vacating* 121 Fed. Cl. 658 (2015) ("*Caquelin I*").  The government had argued on appeal that a recent decision of the Supreme Court, *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012), had undercut prior decisions by the Federal Circuit (and, indeed, the Supreme Court) relating to the analysis of takings claims in the rails-to-trails context. *See Caquelin II*, 697 Fed. Appx. at 1019 ("*[E]n banc* review may be warranted" because the

"*Arkansas Game* decision does raise questions about *Ladd* [*v. United States*, 630 F.3d 1015 (Fed. Cir. 2010)]," and other earlier rails-to-trails decisions by the court of appeals.).

The case has its genesis in a Notice of Interim Trail Use ("NITU") issued by the federal Surface Transportation Board ("STB"), which authorized conversion of a portion of a railroad line located in Hardin and Franklin Counties, Iowa and its attendant right-of-way into a public recreational trail pursuant to Section 208 of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, 98 ("Trails Act") (codified at 16 U.S.C. § 1247(d)).[1] Plaintiffs, Kenneth Caquelin, now deceased,[2] and his wife, Norma Caquelin, owned two parcels of land adjacent to and under the railroad right-of-way on the date of the STB's action.[3]  For one parcel, the predecessor railroad had acquired its interest by a right of way deed, and for the other parcel, the railroad had acquired its rights by condemnation. Stip. ¶ 1; *Caquelin I*, 121 Fed. Cl. at 660.  The successor railroad held easements limited to railroad purposes that were exceeded by issuance of the NITU, rendering the government liable for taking plaintiffs' property without just compensation under the Fifth Amendment. *See, e.g.*, *Preseault I*, 494 U.S. at 12-13 (holding that the Tucker Act, 28 U.S.C. § 1491(a), provided a remedy for an alleged taking of a property

---

[1]The original purpose of the Trails Act "was to preserve unused railroad rights-of-way by converting them into recreational trails." *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006) (citing *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1 (1990) ("*Preseault I*")). The Trails Act Amendments in 1983 added new provisions that created a "railbanking" system that allowed rail carriers to transfer management of rail corridors to private or public entities for interim management as public recreational trails while preserving the ability to reactivate the abandoned rail corridors for potential future railroad use.  16 U.S.C. § 1247(d).  A NITU serves as the mechanism that bars the fee owners' reversionary interest during the pendency of trail-use negotiations. *See Preseault I*, 494 U.S. 8, 10; *Barclay*, 443 F.3d at 1374.

[2]Mr. Caquelin died on July 24, 2017.  Tr. 674:9-14; Corrected Stipulations of Fact for Trial ("Stip.") ¶ 5, ECF No. 51.  On the date the NITU was issued, Mr. and Mrs. Caquelin held the property as joint tenants with full right of survivorship, Stip. Ex. 4, and Mrs. Caquelin as the surviving spouse succeeded to title upon her husband's death, *see id.*

The transcript of the trial will be cited as "Tr. ___."  The Stipulations incorporate extensive documentary exhibits, and citations to those exhibits will appear as "Stip. Ex. ___." Defendant's exhibits will be cited as "DX ___," and plaintiff's exhibits will be cited as "PX ___."

[3]Mrs. Caquelin is a widow in her 80s who was in ill health at the time of the trial and not able to testify despite having been called by the parties to do so.  Tr. 445:22 to 447:8, 671:10 to 674:19.  The property at issue was purchased by Mrs. Caquelin's great grandfather, William Summer Nobles in 1892.  Stip ¶ 2.  Mrs. Caquelin's family has owned the farmland since that purchase.  Stip. ¶ 2.  In Mrs. Caquelin's hands, the property thus qualifies as a "Century Farm" in Iowa parlance.  The house in which Mrs. Caquelin was born and raised abuts her farmland and was viewed during the site visit.  Tr. 672:22 to 673:9.

interest in land previously used as a railroad right-of-way that had been transferred to a public entity for use as a public trail).[4]

## FACTS[5]

The parties' dispute concerns a 10.46-mile strip of land extending from milepost 201.46 near Ackley, Iowa, to milepost 191.0, outside Geneva, Iowa, upon which the North Central Railway Association, Inc. ("North Central Railway") previously acquired easements for railway purposes through a series of mesne conveyances. *Caquelin I*, 121 Fed. Cl. at 660. A railroad had been constructed by the Eldora Railroad and Coal Company in 1866 from approximately one mile north of Eldora, Iowa, to Ackley, Iowa for the purpose of transporting coal from the Coal Bank Hill area in the Iowa River valley near Eldora[6] to a connection at Ackley with an east-west railroad, then known as the Dubuque & Sioux City Railroad, which later became part of the Illinois Central Railroad. Stip. Ex. 11 at STB000023. Between 1868 and 1870, the line was extended north to Northwood, Iowa, and south to Marshalltown, Iowa, where it connected with the Chicago & North Western Railroad. *Id*. A predecessor extending the rail line, the Central Railroad of Iowa,[7] acquired rights in one of the parcels at issue by a right-of-way deed, *see Caquelin I*, 121 Fed. Cl. at 660 (citing Pls.' Mem. in Support of Mot. for Partial Summ. Judgment on Liability ("Pls.' Mot."), at 13 & Exs. A-2 (Maps of the Line) & J (Right of Way Deed by Henry and Maria Ihde to Central Railroad of Iowa (filed Apr. 30, 1870)), and rights to the second parcel by a condemnation, *see id*. (citing Pls.' Mot. at Ex. K (Latham Condemnation, Franklin County, Iowa (witnessed Aug. 31, 1870))). North Central Railway acquired property rights in the rail corridor in 1989. *See* United States' Cross-Mot. for Summ. Judgment & Mem. in Support, and Opp'n to Pls.' Mot. for Partial Summ. Judgment on Liability ("Def.'s Cross-Mot.") at 2-3, ECF No. 18. The rail corridor traverses a rural area of fertile agricultural land. *See id*. at 2; *see also* Stip. Ex. 6 (Franklin County Assessor's map of parcels). Indeed, the segment of the rail corridor at issue in this case is comprised of Klinger silty clay loam and

---

[4]The Taking Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

[5]The recitation of facts is drawn from the record of the trial held in Eldora, Iowa from May 30, 2018 through June 1, 2018, stipulations of fact filed by the parties in advance of trial, and uncontested facts developed during proceedings in 2015 related to the parties' cross-motions for partial summary judgment on liability.

[6]Mining was discontinued many years ago. The locality of the mine now is preserved in name by the Coal Bank Hill Bridge, which traverses the Iowa River between Fallen Rock State Preserve to the north and Pine Lake State Park to the south. The bridge is listed on the National Register of Historic Places.

[7]The Central Railroad of Iowa was succeeded by the Central Iowa Railway and eventually became part of the Minneapolis and St. Louis Railway system.

Dinsdale silty clay loam (designated soil types 184 and 337B, respectively), DX22, which both have a very high Corn Suitability Rating ("CSR") of 95, DX 11; *see also* Tr. 246:20 to 248:5.[8]

Ms. Caquelin is a resident of Cedar Falls, Iowa, who acquired the two parcels, numbered 1219200016 and 1219200001, in Franklin County, Iowa, through inheritance from her grandparents. Stip. ¶¶ 2-5 & Ex. 6 (map of parcels).[9]  Plaintiff alleges that under Iowa law, she gained fee title up to the centerline of the rail corridor in question. Compl. ¶ 4; *see also* Pl.'s Mot. at 1-2, Exs. G (Warranty Deed (May 11, 2007)), H (Summary of Parcels (Jan. 15, 2015)), & I (Map of Parcels); Hr'g Tr. 5:21-25 (May 14, 2015).

On May 13, 2013, North Central Railway filed a Proposed Abandonment with the STB,[10] including a verified notice of exemption pursuant to 49 C.F.R. § 1152.50, seeking to abandon the railroad line on the grounds that "no local traffic [or overhead] has moved over the [l]ine for at least two years." Stip. Ex. 11 at STB000006, STB000009 (Notice of Exemption-Abandonment Exemption (May 9, 2013)).[11]  Under STB's regulations, the abandonment exception for the

---

[8]CSR ratings extend from 00 (nonexistent) to 100 (perfect).  By comparison, CSR ratings for other good-to-excellent farmland that was at issue in another rails-to-trails case, located in the same general area of Iowa, ranged from 56 to 97.5.  *See Sears v. United States*, 132 Fed. Cl. 6, 16 (2017), *aff'd*, 726 Fed. Appx. 823 (Fed. Cir. 2018).  For a more detailed description of CSR ratings in Iowa, which are based on soil information generated by the United States Department of Agriculture and adapted by Iowa State University to take account of variables pertinent to land in the State, *see Sears*, 132 Fed. Cl. at 13-14 nn.11, 12.

[9]In 1982, Mrs. Caquelin inherited a real estate contract from her mother Lois R. Hoffman. Stip. ¶ 3; *see also* Stip. Ex. 1 (real estate contract between Lois R. Hoffman and Gary L. and Joyce M. Fairbanks (Mar. 13, 1981)).  At that point, she held legal title but not equitable title. *See Installment Land Contract*, *Black's Law Dictionary* (10th ed. 2014).  That conditional contract for sale was never fully implemented, and the equitable as well as legal title was fully vested in Mrs. Caquelin in 1986.  Stip. ¶ 4; *see also* Stip. Exs. 2, 3 (deeds recorded Dec. 29 and 30, 1986).

[10]The STB has authority "to regulate the construction, operation, and abandonment of most railroad lines in the United States."  *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004).

[11]49 C.F.R. § 1152.50 addresses abandonments and discontinuances of service and trackage rights that are exempt from the generally applicable procedures outlined under 49 U.S.C. § 10903 and provides, in pertinent part:

An abandonment or discontinuance of service or trackage rights is exempt if the carrier certifies that *no local traffic has moved over the line for at least 2 years* and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a state or local government entity acting on behalf of such user) regarding cessation of service

railroad line was scheduled to become effective July 5, 2013.  *See* Stip. Ex. 11 at STB000074-75 (STB Notice (June 5, 2013)).

Shortly before the abandonment exception became effective, on June 24, 2013, the City of Ackley and the Iowa National Heritage Foundation (collectively "the City") filed a request for issuance of a Public Use Condition under 49 U.S.C. § 10905 and a NITU under the Trails Act. *See* Stip. ¶ 12.a & Ex. 11 at STB000066 (Pet. for Recons. (filed June 21, 2013 and entered June 24, 2013)); Hr'g Tr. 6:4-11 (May 14, 2015) (noting that "the railroad initially applied purely for abandonment").[12]  Several days later, on June 27, 2013, a letter from North Central Railway was entered with the STB indicating its agreement with the requested public use condition and related restrictions and its willingness to negotiate with the Iowa Trails Council regarding acquisition of the railroad line.  *See* Stip. ¶ 12.c; *see also* Stip. Ex. 11 at STB000073 (Letter to Chief, Section of Administration, Office of Proceedings, STB from Counsel for North Central Railway (filed June 24, 2013 and entered June 27, 2013)).  On July 3, 2013, STB accordingly issued a NITU for the railroad line.  Stip. Ex. 11 at STB000077 (STB Decision and Notice of Interim Trail Use or Abandonment (July 3, 2013)).[13]  The NITU provided a 180-day period during which the railroad could negotiate with the potential trail group regarding "railbanking and interim trail use" of the corridor.  *Id.* at STB000080.  After the 180-day period, absent an extension, the NITU would expire by its own terms, at which point the railroad would be authorized to abandon the line.  *See id.* at STB000081.

-------

over the line either is pending with the Board or any U.S. District Court or has been decided in favor of the complainant within the 2-year period.  The complaint must allege (if pending), or prove (if decided) that the carrier has imposed an illegal embargo or other unlawful impediment to service.

49 C.F.R. § 1152.50(b) (emphasis added).

[12]49 U.S.C. § 10905 provides, in relevant part:

When the [STB] approves an application to abandon or discontinue . . . , the [STB] shall find whether the rail properties that are involved in the proposed abandonment or discontinuance are appropriate for use for public purposes, including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation.  If the [STB] finds that the rail properties proposed to be abandoned are appropriate for public purposes and not required for continued rail operations, the properties may be sold, leased, exchanged, or otherwise disposed of only under conditions provided in the order of the [STB].

49 U.S.C. § 10905.

[13]Mr. and Mrs. Caquelin maintained ownership over the two parcels in question on that date.

On October 15, 2013, the Iowa Trails Council filed a Trail Use Request with the STB, and negotiations over a Trail Use Agreement ensued, contemplating that the rail corridor would be used as a public recreational trail with railbanking for possible future activation as a railroad. *See Caquelin I*, 121 Fed. Cl. at 662.[14]  No agreement was reached, however.  On December 6, 2013, the Iowa National Heritage Foundation requested a 180-day extension to continue negotiations, *see* Stip. Ex. 11 at STB000082 (Letter to Cynthia T. Brown, STB, from President, Iowa Natural Heritage Foundation (Dec. 6, 2013)), but North Central Railway did not file a letter indicating its consent, and on December 30, 2013, the NITU expired, *see id.*; *see also* Hr'g Tr. 12:7-15, 29:22 to 30:4 (May 14, 2015).  On March 31, 2014, the railroad consummated abandonment of its line and the STB's regulatory jurisdiction ended.  Stip. ¶ 12.f & Ex. 11 at STB000085 (STB Decision (May 9, 2014)).  On April 24, 2014, North Central Railway notified the STB that it had exercised the authority to fully abandon the line.  *Id.* ¶ 12.f & Ex. 11 at STB000084 (Notice of Consummation (Apr. 24, 2014)).

On January 16, 2014, Mr. and Mrs. Caquelin filed suit in this court.  Their complaint alleged an uncompensated taking of their property in contravention of the Fifth Amendment. Specifically, plaintiffs argued that cessation of railroad activities across the burdened property effected an abandonment under Iowa law of the railroad-purposes easement, leading to a taking when the STB forestalled plaintiffs from regaining use and possession of their property.  Compl. ¶¶ 7-9.  Plaintiffs averred the government's action "diminish[ed] the value of the remaining property[] and [engendered] delay damages based upon the delayed payment of compensation." Compl. ¶ 10.  Plaintiffs requested damages equal to the "full fair market value of the property . . . on the date it was [allegedly] taken, including severance damages and delay damages, and costs and attorneys' fees" in addition to "such further relief as [the] [c]ourt may deem just and proper." Compl. at 3.[15]

---

[14]The complaint incorrectly lists the date as October 15, 2001.  Compl. ¶ 6.

[15]At trial, the parties conceded that the segment of the rail corridor at issue was limited to the west half of the corridor south of milepost 191, an area of .359 acres.  *See* PX 2 (Expert Report of Dr. James B. Kliebenstein) at 7, 9; DX 18 (Expert Report of Gary Thien) at 7, 16; Tr. 204:15 to 207:18, 236:11 to 237:9, 511:4 to 516:20.

Mrs. Caquelin should have ownership of the west half of the corridor north of milepost 191 but for a cloud on title attributable to improper deeds transferring her interest to her neighbor to the east, David Wohlford.  The corridor north of milepost 191 was subject to a NITU issued on October 23, 2001, Stip. Ex. 8 at STB000142, but no trail agreement was ever reached.  The railroad quitclaimed its right-of-way in the entirety of that part of the corridor to D.W.R.R., LLC on October 21, 2002.  Stip. Ex. 9 at US000033-34.  D.W.R.R., LLC was controlled by Don Wohlford, David Wohlford's father.  On December 18, 2003, D.W.R.R. LLC quitclaimed the former railroad corridor north of milepost 191 to Mrs. Caquelin's neighbor to the east, David Wohlford.  Stip. Ex. 10 at US 000039.  This set of quitclaim deeds inappropriately encompassed Mrs. Caquelin's residual fee interest as well as that of Mr. Wohlford.

On January 16, 2015, plaintiffs filed a motion for partial summary judgment on the issue of liability. *See* Pls.' Mot. On March 6, 2015, the government responded with a cross-motion for partial summary judgment on the same issue. *See* Def.'s Cross-Mot. These motions were thoroughly briefed and were argued at a hearing held on May 14, 2015. The court granted plaintiff's motion for summary judgment and denied defendant's cross-motion for summary judgment on June 17, 2015. *Caquelin I*, 121 Fed. Cl. at 658. In its opinion, the court concluded that the government was liable to the Caquelins under the three-part analysis outlined by the Federal Circuit in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) ("*Preseault II*"). *See Caquelin I*, 121 Fed. Cl. at 663-67. Following this decision, on November 18, 2015, the two parties stipulated to the amount of just compensation, including principal and interest, of $900.00. Stipulation as to Just Compensation ("First Stip.") at 1, ECF No. 30. Judgment was entered under Rule 54(b) of the Rules of the Court of Federal Claims ("RCFC") on January 6, 2016. Judgment, ECF No. 32. A few months later, the government submitted a notice for appeal to the Federal Circuit. Notice of Appeal, ECF No. 35. In the appeal, the government argued "the 180-day blocking of reversion was not a *categorical* taking, but instead calls for a multi-factor analysis . . . invok[ing] the general 'regulatory takings' framework set forth to govern land-use restrictions in *Penn Central* . . . and the temporary-takings analysis set forth to govern the repeated controlled floodings . . . at issue in *Arkansas Game & Fish* . . . ." *Caquelin II*, 697 Fed. Appx. at 1019 (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *Arkansas Game*, 568 U.S. 38-40). At bottom, the government's "principal argument is that *Ladd* should be overruled *en banc*" by the Federal Circuit and replaced by a more ad-hoc multi-factor analysis. *Id.*

In a short *per curium* opinion, the Federal Circuit vacated and remanded this court's decision to grant summary judgment in favor of the plaintiffs. The Federal Circuit opined that "[e]*n banc* review *may* be warranted" since "*Arkansas Game* does raise questions about *Ladd*," and instructed this court to further develop the litigation record to determine "how the government-advanced multi-factor analysis applies in this case, on the assumption that such an analysis is the governing standard." *Caquelin II*, 697 Fed. App. at 1019-20 (emphasis added). The appellate court noted that "this panel cannot declare *Ladd* no longer to be good law based on . . . *Arkansas Game*." *Id.* at 1019. The Federal Circuit also requested this court to "discuss[] what facts invoke which of the Supreme Court's standards" in order to "focus the appellate consideration of the issues raised by the government." *Id.* at 1020. In short, this court was charged with developing a conceptual framework followed by analysis of a factual record bearing on the government's proffered multifactor analysis approach.

Following this prime directive of the Federal Circuit, the court started the process of developing the requested factual record. In preparation for the trial, on April 3, 2018, the parties filed joint stipulations of fact. *See* Stipulations of Fact for Trial, ECF No. 48. This was followed by revised stipulations of fact for trial that corrected some minor errors, filed May 10, 2018. *See* Stip. A three-day trial was held in Eldora, Iowa from May 30, 2018 to June 1, 2018. At the trial, the court heard from both fact and expert witnesses and conducted a site visit on the second day of trial for the court to see and examine the land at issue and to hear testimony from witnesses about the land on site.

After the trial, the court requested post-trial briefing by the parties to further hone the factual record. Scheduling Order of June 11, 2018, ECF No. 61. Plaintiff filed her opening post-trial brief on July 20, 2018. Pl.'s Post-Trial Br., ECF No. 66. The government filed its responsive post-trial brief on August, 29, 2018. Def.'s Post-Trial Br., ECF No. 68. A reply brief was filed by the plaintiff on September 11, 2018, Pl.'s Post-Trial Reply Br., ECF No. 69, and a closing argument was held on September 19, 2018.

## STANDARDS FOR DECISION

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The inquiry into whether a compensable taking has occurred requires this court to resolve "a question of law based on factual underpinnings." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (citations omitted); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (stating that courts perform "an 'ad hoc, factual' inquiry" in analyzing whether a compensable taking has occurred (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979))). In this case, Mrs. Caquelin, as plaintiff, bears the burden of proving the relevant factual underpinnings of her claim against the United States, and must generally proffer "'evidence which is more convincing than the evidence which is offered in opposition to it.'" *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1350 (Fed. Cir. 2006) (quoting *Hale v. Department of Transp.*, 772 F.2d 882, 885 (Fed. Cir. 1985)).

To establish a viable takings claim, Mrs. Caquelin must prove two things. First, she must establish that she had "a property interest for purposes of the Fifth Amendment." *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing *Conti v. United States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002); *Wyatt*, 271 F.3d at 1096 ("[O]nly persons with a valid property interest at the time of the taking are entitled to compensation.")).[16] Second, Mrs. Caquelin must establish that the government's actions "amounted to a compensable taking of that property interest." *American Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

## ANALYSIS

The procedural posture of this case is unusual. The court is charged with developing a factual record, accompanied by legal analysis, to enable the Federal Circuit to make an informed decision regarding which analytical test should apply to temporary takings resulting from the issuance of a NITU. To complete this task, the court will first comply with the court of appeals' mandate to "discuss[] what facts invoke which of the Supreme Court's standards," *Caquelin II*, 697 Fed. Appx. at 1020, and develop a conceptual framework for takings analysis. After this framework is established, the court will apply the factual record of this case to the *Arkansas Game* multi-factor analysis as commanded. *See id.*

---

[16] That Mrs. Caquelin has the requisite property interest in the pertinent segment of the rail corridor is not disputed. *See Caquelin I*, 121 Fed. Cl. at 663-67.

## I.   Takings Principles

Generally, the government can take property by two means: physically or by regulation. Both types of takings can be further divided into two categories: categorical and non-categorical. Categorical takings deprive the owners of *all* economically viable use of their property.  Non-categorical takings, on the other hand, deprive the owner of *some* amount of the economic use of their land, either through physical invasion or onerous regulation.  Takings can be either permanent or temporary in duration.

### A.   Physical Takings

*1.   Categorical physical takings.*

*a.   Permanent categorical physical takings.*

The classic takings case – indeed, the salient exemplar of a taking under the Takings Clause of the Fifth Amendment – involves a categorical physical taking that is permanent in duration.  This situation is also the most straightforward to analyze.  In these cases, the government physically and permanently seizes possession of the entirety of a landowner's property for public use.  *See, e.g.*, 28 U.S.C. § 1358 (relating to "proceedings to condemn real estate for the use of the United States or its departments or agencies").  Physical possession of land occurs when the "owner [is] deprived of valuable property rights, even [if] title ha[s] not formally passed." *Caldwell v. United States*, 391 F.3d at 1235 (citing *United States v. Dow*, 357 U.S. 17, 23 (1958)).  In permanent categorical physical taking cases, the taking itself is often uncontested – the litigation instead typically focuses on "what compensation [is] just." *Hendler v. United States*, 952 F.2d 1364, 1371 (Fed. Cir. 1991).  It does "no[t] matter how weighty the asserted 'public interests' involved" are – the government must pay compensation for a "permanent physical occupation." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 1028 (1992) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)).

*b.   Temporary categorical physical takings.*

By contrast, a *temporary* categorical physical taking occurs when the government physically seizes the entirety of a landowner's property for public use, but returns it to the original owner after a period of time.  "[C]ompensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321-23 (2002) (citing *United States v. General Motors Corp.*, 323 U.S. 373 (1945)).  When a physical taking is categorical, courts look to the temporal element to determine the measure of just compensation under the Fifth Amendment, not whether a claim arose at all.  *See Ladd*, 630 F.3d at 1025; *Yuba Nat. Res., Inc. v. United States*, 821 F.2d 638, 641-42 (1987).

For example, in *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), the government seized plaintiff's laundry facility during World War II to provide laundry and dry

cleaning services to the armed forces.  The Supreme Court found the taking to be categorical, as the government possessed the entirety of plaintiff's property.  *Id.* at 3.  But it was ultimately temporary, as the government returned the property after the war ended.  *Id.* at 3-4.  Thus, the principal disagreement in *Kimball Laundry* was over how compensation should be calculated, not whether a taking occurred.  *See id.* at 6 (stating that "the question of compensation for the temporary taking of petitioner's land, plant, and equipment" was at issue.).

Similarly, *United States v. Pewee Coal Co.* also involved a temporary categorical taking during World War II.  341 U.S. 114 (1951).  In *Pewee Coal*, the government seized control of various coal mines across the country in 1943 to circumvent a nationwide strike of miners.  *Id.* at 115.  A mine was returned to the original owners after five and one-half months of government occupation, and the operators of the mine sued for compensation.  *Id.*  The Court found the seizure of the mine to be "'in as complete a sense as if the [g]overnment held full title and ownership.'"  *Id.* at 116 (citing *United States v. United Mine Workers*, 330 U.S. 258 (1947)).  Much like *Kimball Laundry*, the majority of the opinion was devoted to detailing *how much* compensation the mine owners were entitled to for the taking period, rather than if a taking had occurred at all.  *Id.* at 116-17.

In sum, when the government physically seizes the entirety of a plaintiff's property, it is a categorical taking.  Whether the government exercises permanent or temporary control is only relevant for the calculation of compensation, not whether a taking occurred.  *See, e.g.*, *General Motors*, 323 U.S. at 378 ("Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest . . . , to amount to a [T]aking.").

### 2.  Non-categorical physical takings.

Non-categorical physical takings also require proper compensation under the Takings Clause of the Fifth Amendment.  *See, e.g.*, *Loretto*, 458 U.S. at 419.  A non-categorical physical taking occurs when the government occupies part of an owner's property in some manner.  The physical invasion could be as small as a single cable box, *see id.*, or as large as multiple wells, s*ee Hendler*, 952 F.2d 1364, 1375-78.  And like categorical physical takings, non-categorical physical takings can be permanent or temporary in duration.

### a.  Permanent non-categorical physical takings.

Permanent, non-categorical physical takings are treated analytically the same as categorical physical takings, except for the calculation of damages.  The Supreme Court has consistently drawn a bright line that *any* permanent physical invasion of property, no matter how negligible, constitutes a taking.  *See Loretto*, 458 U.S. at 436 ("Th[is] traditional rule also avoids otherwise difficult line-drawing problems" with how much physical taking would be too much); *United States v. Causby*, 328 U.S. 256, 261-65 (1946) (holding that repeated flights by government planes through the plaintiffs' airspace constituted a permanent non-categorical physical taking); *Hendler* 952 F.2d at 1375-78 (finding government-drilled wells on a plaintiff's property constituted a permanent non-categorical physical taking that required compensation).

When physically, and permanently, taking a part of property, "the government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand. . . . it effectively destroys *each* of these rights." *Loretto*, 458 U.S. at 435 (emphasis in original).

The seminal case of this type in the Supreme Court is *Causby*.  The plaintiffs in *Causby* were farmers who sued the government for "frequent and regular flights of army and navy aircraft over [plaintiffs'] land at low altitudes" that injured chickens and forced them to close the farm. 328 U.S. at 258.  Despite the fact that the "enjoyment and use of the land [was] not completely destroyed," the Court found a physical taking because "the use of the airspace immediately above the land [] limit[ed] the utility of the land and cause[d] a diminution in its value." *Id.* at 262.  And, "the fact that [the government planes] do[] not occupy [the land] in a physical sense – by the erection of buildings and the like – is not material. As we have said, the flight of airplanes [in this case] . . . is as much an appropriation of the use of the land as a more conventional entry upon it." *Id.* at 265.  The Court in *Causby* effectively recognized the existence of a non-categorical physical taking, *i.e.*, one that does not completely deprive the owner of all economic value, but is of a permanent nature.

In *Loretto*, Court formally recognized the principle that *any* permanent physical invasion of property constitutes a taking, no matter how "minimal [the] economic impact on the owner." 458 U.S. at 434-35.  The Court in *Loretto* found a non-categorical permanent physical taking from the imposition of cable boxes on the plaintiffs' property – despite the small impact on the property's value. *See id.* at 434, 441-42.  "Once the fact of occupation is shown, of course, a court should consider the *extent* of the occupation as one relevant factor in determining the compensation due.  For that reason, moreover, there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance." *Id.* at 437 (emphasis in original).

Public easements being imposed on a landowner can also constitute permanent non-categorical physical takings. *See Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) (citing *Causby*, 328 U.S. at 265; *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922)).  In *Kaiser Aetna*, the Court held that "even if the [g]overnment physically invades only an easement in property, it must nonetheless pay just compensation." *Id.* at 180.  Similarly, in *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1991), Justice Scalia wrote, "[t]o say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather . . . 'a mere restriction on its use,' . . . is to use words in a manner that deprives them of all their ordinary meaning." *Id.*  The right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.* (quoting *Loretto*, 458 U.S. at 433).

The Federal Circuit followed a similar path in recognizing permanent non-categorical physical takings. *See, e.g.*, *Hendler*, 952 F.2d at 1375-78.  In *Hendler*, the Federal Circuit found ground wells drilled by the government on the plaintiffs' property to monitor pollution constituted a permanent non-categorical physical taking. *See* 952 F.2d at 1375-77.  The wells were permanent because "[y]ears have passed since the [g]overnment installed the first wells . . .

11

[which are] 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement." *Id.* at 1376.  The government's order also authorized state and federal officials to have continuing access to the property.  *Id.* at 1374.  Recognizing that on a long enough timeline, every government action could be considered "temporary,"[17] the court noted "[a]ll takings are 'temporary,' in the sense that the government can always change its mind at a later time." *Id.* at 1376.  The court drew a distinction between "governmental activities which involve an occupancy that is transient and relatively inconsequential," such as the "parked truck of the lunchtime visitor," and the more "permanent" nature of the embedded wells.  *Id.* at 1376-77.  The court noted that "the concept of permanent physical occupation does not require that in every instance the occupation be exclusive, or continuous and uninterrupted."  *Id.* at 1377.  Rather, indefiniteness means permanency.  *Id.* at 1376.

The Federal Circuit provided additional guidance on distinguishing between temporary and permanent non-categorical physical takings in *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1363 (Fed. Cir. 2012).  The court concluded that takings are considered permanent even if the landowner could take "specified action" to terminate the taking.  670 F.3d at 1368-69 ("In *Loretto*, was possible for the landowner to act in a manner so as to avoid the taking . . . [because] a landlord could avoid the law's requirements by ceasing to rent the building to tenants, but [] this did not make the cable company's invasion of the property not permanent.") (citing *Loretto*, 458 U.S. at 421, 438-39).  In *Otay Mesa*, the government installed roads, a tented structure, and underground sensors outside a previously-granted twenty-foot-wide easement on property in California adjacent to the border with Mexico.  670 F.3d at 1360-61.  The Federal Circuit concluded that the taking by the government was permanent, even though the plaintiff in *Otay Mesa* could have "decide[d] to develop the entirety of its property, thereby terminating the sensor easement."  *Id.* at 1368.  Arbitrary end dates are similarly unpersuasive in finding whether an easement was temporary or permanent in nature.  *Id.* at 1368.  "[O]nly such activities [like] abandonment of the easement by the Border Patrol . . . can end the easement."  *Id.*

   b.   *Temporary non-categorical physical takings.*

Ordinarily, temporary governmental action will give rise to a taking if permanent action of the same character would constitute a taking.  *See Arkansas Game*, 568 U.S. at 26-27, 32-34; *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318-20 (1987).  That is true for non-categorical as well as categorical physical takings, but temporary non-categorical physical takings have to be differentiated from torts.  *See Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003).  That line-drawing exercise can be significant with government-induced flooding, *see*, e.*g*., *Arkansas Game*, 568 U.S. at 36, although "[t]here is thus no solid grounding in precedent for setting flooding apart from all other government intrusions on property," *id*.

In this context, the Supreme Court employed six interrelated factors in *Arkansas Game* to help determine if a temporary non-categorical physical taking occurred.  568 U.S. at 38-39.

―――――――――――――――――――

[17]This echoes the famous economist John Maynard Keynes, who famously stated "[i]n the long run we are all dead."

Those factors were "time," "inten[t]," "forseeab[ility]," "character of the land," "reasonable investment-backed expectations," and "severity of the interference." *Id*. *Arkansas Game* involved the flooding and destruction of forest land caused by the Army Corps of Engineers through its operations of a dam during the period 1993 through 2000. *Id*. at 28. Those operations deviated from planned water-release rates to benefit farmers and recreational users. *Id*. at 27. Water was stored behind the Corps' dam from September to December, but was released above historical norms during the ensuing tree-growing season, *id*. at 28, saturating soil and weakening root systems of trees to the point the trees were destroyed, *id*. at 30. The Corps eventually ceased the deviations and returned to more normal water flows. *Id*. at 28. The Court found that the flooding could constitute a taking. *Id*. at 38-40.

Some of the factors employed in *Arkansas Game* have origins in accepted takings jurisprudence. For example, "inten[t]" seems to correlate with authorized government action, although that may not always be factually the case. Additionally, "character of the land" and "reasonable investment-backed expectations" have roots in regulatory takings jurisprudence, although "character of the *land*," *Arkansas Game*, 568 U.S. at 39 (emphasis added), is a reversal from the focus in regulatory takings on "character of the government *action,*" *Penn Central*, 438 U.S. at 124 (emphasis added). Contrastingly, factors relating to tort concepts, *i.e.*, "forseeab[ility]" and "severity of the interference" were employed in *Arkansas Game*.[18] Finally, "time" concerns the duration of the temporary interference.

On the other hand, if landowners suffered "an incidental or consequential injury . . . caused, for example, by improvident conduct on the part of the government in managing its property," such landowners may have to look to tort law. *See Ridge Line*, 346 F.3d at 1356. In applying the distinction between a foreseeable injury and a merely incidental injury, the Federal Circuit requires plaintiffs to demonstrate that their injury was "the likely *result* of the [government's] act, not that the act was the likely *cause* of the injury." *Cary*, 552 F.3d at 1377 (citing *Moden*, 404 F.3d at 1343) (emphasis added).[19]

---

[18]In this respect, it is not necessary to show that the government specifically intended to invade and injure the property. Rather, the standard allows recovery based on injuries that are the direct, natural, predictable, or probable result of governmental action (*i.e.*, foreseeable). *See Cary v. United States*, 552 F.3d 1373, 1377 (Fed. Cir. 2009); *see also Ridge Line*, 346 F.3d at 1356. That is, a court can infer governmental action for an invasion of a property interest where the plaintiff proves that "the government should have predicted or foreseen the resulting injury." *Cary*, 552 F.3d at 1377 (quoting *Moden v. United States*, 404 F.3d 1335, 1343 (Fed. Cir. 2005)).

[19]Foreseeability can be critical in governmental flooding cases. *See, e.g.*, *Arkansas Game*, 568 U.S. at 23; *Cary*, 552 F.3d at 1373; *Moden*, 404 F.3d at 1335; *Ridge Line*, 346 F.3d at 1346; *Cotton Land Co. v. United States*, 109 Ct. Cl. 816 (1948). In governmental flooding cases, liability can turn on whether the taking was predictable or whether an intervening cause broke the chain of causation. *See Arkansas Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 621-24 (2009), *rev'd*, 637 F.3d 1366 (Fed. Cir. 2011), *rev'd & remanded*, 568 U.S. 23, *aff'd on remand*, 736 F.3d 1364 (Fed. Cir. 2013). Predictability focuses on the end-result, *i.e.*, whether the flooding should have been foreseen based on information available to the government at the

*B.   Regulatory Takings*

Justice Holmes articulated the basic standard for regulatory takings in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414-15 (1922): "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  By this general formulation, Justice Holmes endeavored to balance the legitimate, regulatory needs of the state with the reasonable expectations of property owners.  *Id.* at 413-15 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for each such change in the general law.").  Following *Pennsylvania Coal*, courts have struggled to define a "set formula" for determining how much regulation is too much.  *See Lucas*, 505 U.S. at 1015.  In doing so, courts have engaged in "essentially ad hoc, factual inquires."  *Id.* (citing *Penn Central*, 438 U.S. at 124).  Over the years, the Court has recognized two types of regulatory takings – categorical and non-categorical.  *See id.* at 1014-1020.

1.   *Categorical regulatory takings.*

A categorical regulatory taking occurs when a "regulation denies *all* economically beneficial or productive use of land . . . for the common good."  *Lucas*, 505 U.S. at 1015-16, 19 (citing *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980), *abrogated by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005); *Nollan*, 483 U.S. at 834; *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987); *Hodel v. Virginia Surface Mining & Reclamation Ass'n.*, 452 U.S. 264, 295-96 (1981)) (emphasis added).  As the Court observed in *Lucas*, the "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation."  *Id.* at 1017 (citations omitted).  And like a categorical physical taking, courts do not need to run through the "case-specific inquiry into the public interest advanced in support of the restraint" to determine if the taking is compensable.  *Id.* at 1015.

In *Lucas*, the regulation at issue prevented the development of certain coastal lots in South Carolina.  505 U.S. at 1006-07.  Plaintiff, owner of two coastal lots on a barrier island, was prevented from building on or developing the two pieces of land.  *Id.*  After the South Carolina trial court found that the land was effectively rendered economically valueless, the Supreme Court held that the regulation would constitute a categorical regulatory taking.  *Id.* at 1030-32.

Cases subsequent to *Lucas* have considered that a categorical regulatory taking is "limited to the 'extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'"  *Tahoe-Sierra*, 535 U.S. at 330 (quoting *Lucas*, 535 U.S. at 1017) (emphasis in original); *see also Lost Tree Village Corp. v. United States*, 787 F.3d 1111, 1116 (Fed. Cir. 2015) ("[A] *Lucas* [categorical regulatory] taking is rare.").  Indeed, even a 93%

───────────────

time of action.  *Id.* at 621-23.  Relatedly, intervening causes might "break the 'chain of causation' between the governmental action and plaintiff's injury."  *Id.* at 615, 623-24 (citing *Cary*, 552 F.3d at 1380.

reduction in land value is not enough to meet the *Lucas* standard for a categorical regulatory taking.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 616 (2001).

In *Lost Tree*, the Federal Circuit addressed noneconomic attributes.  *See Lost Tree*, 787 F.3d at 1111.  In that case, the Army Corps of Engineers denied a wetland fill permit to the plaintiffs to build on waterfront property.  *Id.* at 1114.  The land's value decreased by 99.4% due to the government action.  *Id.*  The government argued that since there was *some* (even if token) property value remaining (regardless of its source), the taking was not categorical and should instead be analyzed through the *Penn Central* lens.  *Id.* at 1116.  The Federal Circuit disagreed, holding that a purely nominal noneconomic residual value would not forestall a categorical regulatory taking.  *Id.* at 1117.

2.  *Non-categorical regulatory takings.*

If a regulation does *not* "den[y] all economically beneficial or productive use of land," courts turn to a "complex of factors," *Palazzolo*, 533 U.S. at 617, which together guide what is "essentially [an] ad hoc, factual inquir[y]," *Penn Central*, 438 U.S. at 124.  *Penn Central* listed three factors to be considered in determining if a non-categorical taking occurred: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment backed expectations;" and (3) "the character of the government action."  *Id.*  "Each of these factors are considered in terms of the 'parcel as a whole.'"  *Seiber v. United States*, 364 F.3d 1356, 1370 (Fed. Cir. 2004) (quoting *Penn Central*, 438 U.S. at 130-31).  Although these factors provide "important guideposts . . . [, t]he Takings Clause requires careful examination and weighing of all the relevant circumstances."  *Palazzolo*, 533 U.S. at 634, 636 (O'Connor, J., concurring); *see also Tahoe–Sierra*, 535 U.S. at 321 (Whether a taking has occurred "depends upon the particular circumstances of the case."); *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992) (Regulatory takings claims "entail[ ] complex factual assessments.").

A non-categorical taking does not require a complete economic loss; rather, a partial but substantial temporary taking may be compensable.  *Palazzolo*, 533 U.S. at 617; *Cienega Gardens v. United States*, 331 F.3d 1319, 1343, 1345 (Fed. Cir. 2003).

C.  *The July 3, 2013 NITU Issued Regarding Mrs. Caquelin's Land*

Mrs. Caquelin's reversionary property interest was blocked by the STB's imposition of the NITU pending consideration of authorizing a trail for public use.  *See* Stip. ¶¶ 12-14.  "In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession – the right to *exclude* strangers, or for that matter friends, but especially the government."  *Hendler*, 952 F.2d at 1374-75 (Fed. Cir. 1991) (citing *Nollan*, 483 U.S. at 831; *Loretto*, 458 U.S. at 426) (internal citations omitted) (emphasis in original).  Here, Mrs. Caquelin was prevented from using her land for *any* purpose for the duration of the NITU.  *See* Stip. Ex. 11 at STB000077-81.  It makes no difference that the NITU did not ultimately result in trail use of the railroad corridor.  The court therefore determines that the NITU issued regarding Mrs. Caquelin's property represents a categorical physical taking, albeit a temporary one.  In these

15

circumstances, the principles identified and applied in *Pewee Coal*, *Kimball Laundry*, and *General Motors* would govern the takings analysis, and the *Arkansas Game* factors would be inapplicable.

Nonetheless, as instructed by the Federal Circuit's mandate, the court will proceed to apply the factors identified in *Arkansas Game* to the factual record established by the trial held on remand.

## II.  Multi-Factor Analysis

The court here is charged with an atypical task.  The Federal Circuit specifically instructed this court to determine "how the government-advanced multi-factor analysis applies in this case, on the assumption that such an analysis is the governing standard."  *Caquelin II*, 697 Fed. Appx. at 1020.  Thus, the court is to act in a supporting role – teeing up the problem for the Federal Circuit to determine if *en banc* review is necessary to examine the *Ladd* precedent and the earlier decisions by the Federal Circuit that provided antecedents for *Ladd*.  As mandated, the court will address the six factors from *Arkansas Game* in turn.

### Factor 1: Time and Duration of the Taking

In *Arkansas Game*, the Supreme Court advised that "time is indeed a factor in determining the existence *vel non* of a compensable taking."  *Arkansas Game*, 568 U.S. at 38-39 (citing *Loretto*, 458 U.S. at 435, n.12; *Tahoe-Sierra*, 535 U.S. at 342; *National Bd. of YMCA v. United States*, 395 U.S. 85, 93 (1969) (finding the brief occupation of a building by the United States military during a riot in Panama did not constitute a taking because the building was already under attack)).  Other temporary takings cases provide additional instruction as to how time factors into the overall calculus.  *See First English*, 482 U.S. at 318 ("'[T]emporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation."); *Tahoe-Sierra*, 535 U.S. at 322 ("[C]ompensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary."); *Yuba*, 821 F.2d at 641-42 ("[T]emporary reversible takings should be analyzed in the same constitutional framework applied to permanent irreversible takings.").

For this case, the duration and time of the taking is undisputed and uncontroversial.  The taking began on the date the STB issued the NITU and blocked Mrs. Caquelin's reversionary interest in the property, *i.e.*, on July 3, 2013, and ended when the NITU expired, *i.e.*, on December 30, 2013, for a total period of 180 days.  *See* Stip. Ex. 11 at STB000077, 80-81.  The duration factors into the calculation of just compensation for Mrs. Caquelin, rather than into the existence *vel non* of a taking.  *See First English*, 482 U.S. at 318-19; *Yuba*, 821 F.2d at 641-42.  When the STB first issued the NITU and blocked Mrs. Caquelin's reversionary interest in the land at issue, it was indeterminate how long the taking would last.  Stip. Ex. 11 at STB000080.  As a factual matter, near the end of the six-month period of the NITU, the Iowa Heritage Council sought a 180-day extension to continue negotiations for a trial, Stip. Ex. 11 at STB000082, but no extension was granted, *see supra*, at 6.

The government, in its post-trial brief, emphasizes that the NITU "was in place for only 180 days," and that "there was no extraordinary delay in the regulatory abandonment proceeding." Def.'s Br. at 46-47; *see also id.* at 41-50. But as discussed previously, the NITU deprived Mrs. Caquelin of *all* use of the land at issue during the time it was in effect. *See* Stip. Ex. 11 at STB000077; *see also Caldwell*, 391 F.3d at 1235 (The "triggering event for any takings claim under the Trails Act occurs when the NITU is issued."). It does not matter for the takings analysis that the NITU was "only" in place for 180 days or that it was resolved without an "extraordinary delay." The time is relevant only to the calculation of damages. *See Yuba*, 821 F.2d at 641-42. What matters is on July 3, 2013, the government acted in a way that completely deprived Mrs. Caquelin the use of her property for what was then an unspecified amount of time. *See* Stip. Ex 11 at STB000077-81.

The court concludes that the time factor weighs in favor of finding a taking of Mrs. Caquelin's property. *See Banks v. United States*, 138 Fed. Cl. 141, 150 (2018) (citing *Kimball Laundry*, 338 U.S. 1) (additional citations omitted); *see also Balagna v. United States*, 138 Fed. Cl. 398, 403 (2018) ("[A]pplication of the *Arkansas Game* factors would not be likely to yield a result different from that reached under controlling precedent.") (internal citation omitted). Mrs. Caquelin was not deprived of her land by the mere "parked truck of the lunchtime visitor." *Hendler*, 952 F.2d at 1376. Rather, the NITU denied Ms. Caquelin useable time to reclaim the plot of land for the next planting season and also delayed her ability to harvest the valuable timber on the segment.

*Factor 2: Degree to Which the Invasion was Intended*

The next factor the Supreme Court lists as "relevant to the takings inquiry," is the "degree to which the invasion is intended." *Arkansas Game*, 568 U.S. at 39. This factor cannot be disputed. The STB issued the NITU with intent to block Ms. Caquelin from any use of the corridor segment while a potential trail use was being negotiated. *See Caldwell*, 391 F.3d at 1233-34 ("[G]overnment action . . . operates to . . . preclude the vesting of [the] reversionary interest."); *Banks*, 138 Fed. Cl. at 150 ("There was no inadvertence here."). The rails-to-trails program was specifically amended to prevent the railroad from abandoning the property and to block the owner's reversionary interest. *See Preseault I*, 494 U.S. at 8 ("By deeming interim trail use to be like discontinuance rather than abandonment, . . . Congress prevented property interests from reverting under state law.") (citing S. Rep. No 98-1, p.9 (1983)). The very purpose of the Act is to effectuate a taking to preserve the option for interim trail use and railbanking. *Id.*

*Factor 3: The Foreseeable Result of Authorized Government Action*

In related vein, *Arkansas Game* referred to consideration of whether the revision was "the foreseeable result of authorized government action." *Arkansas Game*, 568 U.S. at 39 (citing *John Horstmann Co. v. United States*, 257 U.S. 138, 146 (1921) (no takings liability when the government action, an increase of water in a lake due to an irrigation project in Nevada, was not foreseeable); *Ridge Line*, 346 F.3d at 1355-56 (requiring plaintiffs in a flooding case to establish

that "the effects [plaintiff] experienced were the predictable result of the government's action"); *In re Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 799 F.2d 317, 325-26 (7th Cir. 1986) (discussing how "[a]ccidental unintended injuries inflicted by governmental actors are treated as torts, not takings.")).

In *Moden*, 404 F.3d at 1343, the Federal Circuit held that "[a]n inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury," and also that there were no intervening causes that might relieve the government of liability. *See also Cary*, 552 F.3d at 1379 ("Wherever there is an authorized action, the causation prong is satisfied for any injury which is the direct, natural, and probable result of that action."). At bottom, this factor "merely inquires into whether the 'invasion' is the foreseeable result of government action." *Banks*, 138 Fed. Cl. at 150 (citing *Arkansas Game*, 568 U.S. at 39).

Here, the result of the NITU was foreseeable, as the very point of a NITU is to prevent a landowner's reversionary interest from taking effect so the trail negotiating process can take place. *See Preseault I*, 494 U.S. at 7-9. No preternatural clairvoyance is needed in this case to predict that the outcome of the government action is the deprivation of Mrs. Caquelin's property interest. *See id.*; *see also* Stip. Ex. 9 at STB000077-81. It does not matter that there was no "physical presence of federal or third party actors." *Banks*, 138 Fed. Cl. at 150. In the words of Judge Bruggink, the fact that a NITU results in an owner's losing the rights to use their own land "requires no great foresight to anticipate." *Id.* And, no intervening cause that might relieve the government of liability is present here.[20]

Therefore, the court finds that the deprivation of property was a predictable and foreseeable consequence of issuing the NITU. None of the predictability or foreseeability issues present in inverse-condemnation flooding cases is present here.

### Factor 4: Character of the Land at Issue

The fourth factor spelled out by the Supreme Court in *Arkansas Game* is the "character of the land at issue." 568 U.S. at 39 (citing *Palazzolo*, 533 U.S. at 618). In *Arkansas Game*, the Court noted that the trial court "found the [a]rea had not been exposed to flooding comparable to the 1990's accumulations in any other time span either prior to or after the construction of the [d]am." *Id.* In the eyes of the Court, the lack of prior comparable flooding made it more likely that a taking occurred – as the owners of the property had no forewarning of the potential for floodwaters to inundate their land. *See id.*

While this factor is ostensibly similar to one from *Penn Central*, a key difference exists between the test for non-categorical regulatory takings in *Penn Central* and the inquiry detailed by the Supreme Court in *Arkansas Game*. In *Penn Central*, the focus is on the character of the

---

[20]The government's post-trial brief does not address this factor except for a cursory acknowledgement. *See* Def.'s Br. at 34. Instead, the government attempts to shoehorn the non-categorical regulatory taking test from *Penn Central* into the current analysis. *See id.* at 34-67.

*governmental action*. *See Penn Central*, 438 U.S. at 123. But in *Arkansas Game*, the Supreme Court reverses the inquiry and directs courts to look to the "character of the *land* at issue." *See Arkansas Game*, 568 U.S. at 39 (emphasis added). When viewed in the government flooding context, and in conjunction with the other *Arkansas Game* factors, this change in the focus of the inquiry is cogent and instructive. The *Penn Central* factors are designed to determine if a non-categorical regulatory taking occurred, *Penn Central*, 438 U.S. at 124, or, in the words of Mr. Justice Holmes, whether a governmental regulation "goes too far," *Pennsylvania Coal*, 260 U.S. at 415. *Arkansas Game*, by contrast, points courts to determine whether a taking (as opposed to a tort) occurred by looking at the nature of the underlying land, *i.e.*, was it prone to repeated flooding or especially susceptible to flooding. 568 U.S. at 39. This factor, much like factors 2 and 3, seems specifically identified to be deployed in a governmental flooding context.

The character of the land at issue in this case is largely undisputed. The plot of land here is a 0.359 acre segment located adjacent to farmland in Franklin County, Iowa, measuring 313 linear feet in length from the location of the Milepost 191 marker extending to the southeastern corner of the Caquelin property, and fifty feet in width extending from the westerly line of the railroad corridor to the center line. Stip. ¶¶ 19-20 & Ex. 15 at US000288-89; *see also Caquelin I*, 121 Fed. Cl. at 660-61. At the time of the taking, the bucolic segment of land was covered with trees and residual ballast. Because of the ballast, the remainder of the plot was "a couple of feet lower than the rail[bed]." *See* Tr. 71:18 to 72:7, 91:7 to 93:25 (testimony of Mr. Abbas).[21] After a rain, the area could be briefly "wet" because of the slightly elevated railbed, but it is not "wetland," and reclamation of the corridor plus tiling could put the land into productive use. Tr. 71:18 to 72:7, 91:7 to 93:25 (Abbas). Dr. Kliebenstein, an expert who testified on behalf of Mrs. Caquelin, emphasized that the CSR of the soil involved is 95, indicating the soil is extremely productive for the growing of corn and other crops. *Id.* at 208:5-14, 218:24 to 222:1, 225:1-11, 277:7 to 278:4. The court therefore determines this factor also weighs in favor of finding a taking.[22]

---

[21]Mr. Abbas farms Mrs. Caquelin's land under a leasehold. TR. 63:2-25.

[22]"Whether the plaintiffs' property was commercial, farm, or undeveloped land, the United States has no right to simply block control of the surface . . . ." *Banks*, 138 Fed. Cl. at 150. In a case of this type, character of the land is only relevant for determining *compensation*, rather than *liability*. *See id.* It is antagonistic to long-standing takings principles that a plaintiff would be required to demonstrate the various productive characteristics of his or her land in order to prove liability when faced with a categorical physical or regulatory taking. *See, e.g.*, *Loretto*, 458 U.S. 434-35; *Tahoe-Sierra*, 535 U.S. at 323-24; *Horne v. Department of Agriculture*, ___ U.S. ___, ___, 135 S. Ct. 2419, 2428-2430 (2015) ("[O]nce there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation.") (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 747-48 (1997)). Indeed, the government would *still* be liable for taking entirely unproductive land with little value – even if the compensation ultimately paid was nominal. Correspondingly, the fact that the corridor segment is relatively small does not affect liability, although it bears directly on compensation. *See Loretto*, 458 U.S. at 434-36.

*Factor 5: Reasonable Investment-Backed Expectations*

The fifth factor identified by the Supreme Court is "the owner's 'reasonable investment-backed expectations' regarding the land's use." *Arkansas Game*, 568 U.S. at 39 (citing *Palazzolo*, 533 U.S. at 618 (detailing the difference between a categorical regulatory taking where "a regulation has deprived a landowner of 'all economically beneficial use' of the property" and a non-categorical regulatory taking, when a regulation "defeated the reasonable investment-backed expectations of the landowners to the extent that a taking has occurred.")). This factor has its roots in *Penn Central*, where the Court stated it was necessary to determine the "extent to which the [governmental action] has interfered with distinct investment-backed expectations" when examining a non-categorical regulatory taking. 438 U.S. at 124 (citation omitted). And unlike the fourth factor of *Arkansas Game*, there is no reversal of the inquiry.

Other cases provide additional guidance regarding how the court should interpret "reasonable investment-backed expectations." *See Ruckelshaus*, 467 U.S. at 1006-07 (finding that reasonable investment-backed expectations "must be more than a 'unilateral expectation or abstract need'") (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 499 U.S. 155, 161 (1980)); *see also Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018) ("The reasonable, investment-backed expectation analysis is designed to account for property owners' expectation that the regulatory regime in existence at the time of their acquisition will remain in place, and that new, more restrictive legislation or regulations will not be adopted."); *Cienega Gardens*, 331 F.3d at 1345-46 ("This factor also incorporates an objective test – to support a claim for a regulatory taking, an investment-backed expectation must be 'reasonable.'"); *but see Palm Beach Isles Assoc. v. United States*, 231 F.3d 1354, 1364 (Fed. Cir. 2000) ("[I]n accord with *Lucas*, and not inconsistent with any prior holdings of this court, when a regulatory taking, properly determined to be 'categorical,' is found to have occurred, the property owner is entitled to a recovery without regard to consideration of investment-backed expectations. In such a case, 'reasonable investment-backed expectations' are *not* a proper part of the analysis, just as they are not in physical takings cases.") (emphasis added).

Dr. Kliebenstein testified that the land at issue could be reclaimed as high quality farmland and put into very productive use. *See* Tr. 208:5-14; 218:24 to 222:1; 225:1-11; 277:7:7 to 278:4. According to Dr. Kliebenstein, the cost to reclaim the land would be approximately $1,120, Tr. 249:1 to 250:6, with a potential "$3 and $3.50 return for every dollar of investment," Tr. 251:2 to 252:14.

In early July 2013, with the issuance of the NITU, Mrs. Caquelin was denied the opportunity to prepare the land for productive use during the next planting season. *See* Tr. 802:8 to 807:13; Pl.'s Br. at 58-59. Mr. Abbas, who farms the land on a cash-rent basis, Tr. 72:15 to 73:9,[23] has been active in enhancing the productivity of the land by tiling and otherwise

---

[23] In 2012 and 2013, Mr. Abbas paid $18,000 to farm Mrs. Caquelin's property. Stip. Ex. 14 at PLT00020. In 2014 and 2015, the rent was raised to $25,000. *Id.* at PLT000019. But rent

improving it, Tr. 73:21 to 76:9.  He had discussed potential tiling of the corridor segment at issue with the principal of a firm that had performed other reclamation work in the area.  Tr. 80:14 to 81:8, 91:20 to 92:7.  Plaintiff's experts, Mr. Matthews and Dr. Kliebenstein, had also discussed the cost of reclamation with this local contractor.  *See* PX 1 (Matthews Expert Report) at 11; PX 2 (Kliebenstein Expert Report) at 13; Tr. 249:1 to 250:6, 322:2-23.  Therefore, Mrs. Caquelin contends that additional rental income should be considered in her reasonable investment-backed expectations, if such a test were to apply.  *See* Pl.'s Br. at 58-59.

The government, on the other hand, claims that due to the timing of the NITU and the unreclaimed nature of the property, Mrs. Caquelin could not have any reasonable investment-backed expectations.  *See* Def.'s Br. at 29, 50-55; *see also* Tr. 811:1 to 813:14.  Its argument emphasizes the fact that the timing of the NITU precluded Mrs. Caquelin from gaining any farm rental income from the unreclaimed plot in 2013, the year the NITU was issued.  *See* Def.'s Br. at 62-65.  The government acknowledges that Mrs. Caquelin could have started the reclamation process after the NITU expired in December 2013.  *See* Tr. 801:15 to 802:3.[24]

The government further argues that Mrs. Caquelin did not have any reasonable investment backed expectations, as she "acquired her interest in the adjacent farmland by inheritance" with the railroad's easement still present on the property, and she could not have known when or if that easement would be abandoned.  *See* Def.'s Br. at 50-55; *see also* Tr. 786:19 to 788:23.  In addition, the government contends that Mrs. Caquelin "had no actual or objectively reasonable expectations about the use of the 0.359-acre segment of the railroad corridor at the time she acquired her interest in the adjacent property" or "at the time of the government's action."  Def.'s Br. at 51.

The presence of walnut trees on the segment complicates the equation of reasonable investment-backed expectations.  David Matthews, an expert appraiser, testified at trial that one of the walnut trees by itself was worth "several thousand dollars" in his estimation.  Tr. 365:6-23, 368:3 to 370:8, 370:18 to 373:1.  The court also observed the walnut trees on its site visit to the property.  Tr. 461:22-25 to 462:6, 462:24 to 463:6.[25]

---

was reduced back to $20,700 for 2016 and 2017.  *Id.* at PLT000018.  For 2018, the rent was further reduced to $19,200.  *Id.* at PLT00017.

[24]Another lengthy argument made by the government is that the July 3, 2013 issuance date of the NITU precluded the planting of soybeans on the corridor segment in 2013.  *See* Def.'s Br. at 61-65; *see also* Tr. at 547:19 to 548:5, 550:10 to 551:15, 555:8 to 557:13, 795:1 to 802:23.  This argument misses the point – it is irrelevant if Mrs. Caquelin would have been able to reclaim the plot of land for productive use in 2013.  What *is* relevant is that Mrs. Caquelin would have been able to *start* the reclamation process for the next planting season.  *See* Tr. 796:8-19.  As the court pointed out in closing argument, any "prudent landowner" would have used the time from July 3rd onward to clear the property to "prepare it for planting the next season."  *Id.*

[25]The segment at issue is wooded and fairly flat.  Tr. 222:2 to 224:22.  The larger trees are growing at and near the fenceline that separated the railroad corridor from Mrs. Caqulin's

To the court, these trees signify an additional component of Mrs. Caquelin's investment-backed expectations independent of rental income from farming purposes.  This undercuts the government's argument that STB's "interference . . . had no measurable economic impact."  *E.g.*, Def.'s Br. at 54.  The government's argument seems to be myopically focused on the economic viability of growing crops on the taken property during 2013, after the July 3, 2013 NITU issuance date.  *See id.* at 62-67.  Mr. Thien, an appraiser testifying as an expert on behalf of the government, was asked to provide a value for the entirety of the parcels owned by Ms. Caquelin and also to evaluate whether those was any loss of revenue or rent during the period of July 3 through December 30, 2013.  Tr. 497:24 to 498:9.  Despite the exhaustive exposition of Mr. Thien's methodology and his ultimate conclusion regarding the viability of farming the plot, neither the government in its brief, nor Mr. Thien in his testimony, addressed the impact of the walnut trees on the cost to reclaim Mrs. Caquelin's property or on the value of the segment at issue.  *See generally* Def.'s Br. at 59-68; *see also* Tr. 641:12 to 644:24, 645:21 to 647:7, 647:18 to 649:2, 656:17 to 658:4.  Correlatively, Mr. Thein did not consider the extent to which reclamation would provide a positive recovery to Mrs. Caquelin through the enhanced value of the segment.

Therefore, the court finds factor 5 cuts in favor of a taking.  When the NITU was imposed on Mrs. Caquelin's property on July 3, 2013, it denied her the opportunity to perform the economically viable action of reclaiming the land and putting it to productive agricultural use.  Moreover, the presence of the harvestable walnut trees on the property would have covered the cost of reclamation, and this circumstance also bears on objectively reasonable investment-backed expectations.

### Factor 6: Severity of the Interference

For the last factor, the Supreme Court in *Arkansas Game* details that the "[s]everity of the interference figures in the calculus as well."  568 U.S. at 39 (citing *Portsmouth Harbor*, 260 U.S. at 329-30 ("[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [a taking]. Every successive trespass adds to the force of the evidence.")).  In *Portsmouth Harbor*, the Court held the repeated firing of military guns over the plaintiff's beach resort could constitute a taking if the firings were numerous enough.  260 U.S. at 329-30.  This fact pattern has a similarity to *Causby*, where repeated overflights of governmental aircraft over a farm constituted a taking.  328 U.S. at 258, 265.

---

farmland to the west.  Tr. 224:15-20.  The larger trees included at least one walnut that could be harvested as part of the reclamation work, and sold to a veneer company.  Tr. 368:4-22, 461:22 to 462:23.  The price obtainable for the large walnut, apart from the other walnuts and hardwoods, Tr. 368:4 (conservatively, $2,000), would exceed the estimated reclamation cost.  Tr. 82:5-25, 114:10 to 115:7, 249:3 to 250:6 (approximately $1,120); PX 1 at 11.  Walnut trees are prized for their high quality wood and "bring premium prices, and have since the 1700s, with single trees bringing up to $20,000."  Craig Wallin, *Growing Walnut Trees for Profit*, Profitable Plants Digest, https://www.profitableplantsdigest.com/growing-walnut-trees-for-profit/ (last accessed Nov. 5, 2018).

In a rail-to-trails case, however, this factor is less relevant.  *See Banks*, 138 Fed. Cl. at 150.  In rails-to-trails cases, the NITU acts as a complete interference to the plaintiff's use and enjoyment of their land.  The segment here would have reverted to Mrs. Caquelin but for the issuance of the NITU.  She was unable to harvest the valuable walnut trees, prepare the land for the next planting season, or exercise any other of her rights in the "bundle of sticks" that are inherent to landownership.  "None of the rails to trails case precedent[s] with respect to liability has required an additional showing by landowners of what they would have done with the land if they could access it."  *Id.*

For this factor, the court therefore finds the interference to be complete, *i.e.*, as severe as possible.  The court also notes that this factor is redundant in a categorical takings analysis.  If the taking is categorical, *see supra* Part I, the taking of the property is complete and the duration of the taking is only relevant regarding compensation.  Consequently, any categorical taking would also necessarily result in a 100% interference in the use of land, the severest possible level.

### III. SYNOPSIS

After addressing the *Arkansas Game* factors in the context of the facts of this case, the court concludes that a taking occurred when the STB issued a NITU that blocked Mrs. Caquelin's reversionary interest in the land.  The STB's action delayed Mrs. Caquelin's reversion by 180 days.  For that, the government owes just compensation, even if the amount is underwhelming in the circumstances.  *See Loretto*, 458 U.S. at 434-35; *see also* First Stip. ("The parties have stipulated, based on the Court's liability decision, that the principal and interest of just compensation due to Plaintiffs Norma E. and Kenneth Caquelin is $900.00.").  The taking was foreseeable, manifestly intended as a taking, and not mitigated by the character of the land or Mrs. Caquelin's reasonable investment-backed expectations.  *See also Banks*, 138 Fed. Cl. at 150 (finding the same outcome with another NITU); *Balagna*, 138 Fed. Cl. at 403 (same).

Additionally, notwithstanding the foregoing takings analysis, if for whatever reason the court of appeals should conclude that no taking occurred, a tort claim under the Federal Torts Claim Act, 28 U.S.C. § 1346, would become applicable, but such a claim might actually establish that a taking was more appropriate.  That Act provides that:

> "[D]istrict courts . . . shall have exclusive jurisdiction of civil actions or claims against the United States . . . for injury or loss of property . . . caused by the . . . wrongful act or omission of any employee of the [g]overnment . . . , under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

At issue in a tort claim would be the precepts set out in Chapter 7 of the *Restatement (Second) of Torts* (Am. Law Inst. 1965) (entitled "Invasions of the Interest in the Exclusive Possession of Land and its Physical Condition ('Trespass on

Land').").  Under the *Restatement*, "a person who is in possession" is someone who "has the right against all persons to immediate occupancy of land, if no other person is in possession."  *Id.* § 157(c).  With the abandonment by the railroad of its rail line, its easement was extinguished and Mrs. Caquelin was entitled to occupancy of her portion of the said corridor.  "Liability for intentional intrusions on land" is covered by Section 158 of the *Restatement* (heading, capitals omitted), excepting "[c]onduct which would otherwise constitute a trespass if it is privileged."  *Id.*, § 158 cmt. e.  A privilege "may be given by law because of the purpose for which the actor acts or refrains from acting."  *Id.*  The STB's authorization to enter a NITU in anticipation of trail use and rail-banking may constitute such a privilege.[26]  If so, the authorized action presumptively would give rise to a taking.

## CONCLUSION

For the reasons stated, the government is liable for a taking of plaintiff's property on July 3, 2013, upon issuance of the NITU.  In accord with the remand, the court concludes that final judgment for the stipulated amount of principal and interest, $900.00, shall be entered under RCFC 54(b) because there is no just reason for further delay.  The clerk shall issue judgment consistent with this disposition.

The court will address attorneys' fees and expenses under the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654 (c), after the judgment entered under RCFC 54(b) has become final as defined in 28 U.S.C. § 2412(d)(2)(G).  *See* RCFC 54(d)(2)(B)

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

---

[26]*Restatement (Second) of Torts* § 163 pertains to "intended intrusions causing no harm." *Id.* (heading, capitals omitted).  As the *Restatement* explains, "[t]he wrong for which a remedy is given under the rule stated in this Section consists of an interference with the possessor's interest in excluding others from the land."  *Id.*, § 163 cmt. d.